GEORGE H. POWER, APPELLANT, *v.* THE VILLAGE OF ATHENS AND OTHERS, RESPONDENTS.

*City of Hudson — right to establish a ferry — it can authorize a ferry one way only.*

Under the various acts of the legislature incorporating and conferring rights and privileges upon the city of Hudson and the village of Athens, that city has the exclusive right to establish, license and maintain ferries from such city to the western shore of the river, but has no right to establish, license or maintain a ferry from Athens to the eastern shore, such right belonging exclusively to the village of Athens.

APPEAL from a judgment by the plaintiff, entered on the report of a referee.

*Newkirk & Chase,* for the appellant.

*Samuel Hand,* for the respondents.

RUMSEY, J.:

In 1879 the plaintiff took a lease from the city of Hudson, of the ferry between said city and the village of Athens, situated on the opposite side of the Hudson river. The plaintiff insists that the city of Hudson at the time of making the lease to him, had the exclusive right to establish, license and regulate ferries between said city and the opposite side of the river. In the same year, 1879, the village of Athens and the individual defendants, who were then trustees of the village, hired a boat and commenced to run her from Athens to Hudson and back as a ferry boat, carrying passengers and teams for hire. Plaintiff claiming the exclusive right of ferriage under his lease, brought this suit to restrain the defendants from running their boat as a ferry boat.

The city of Hudson is on the east shore of the river, and the village of Athens on the west shore. The referee to whom the case was referred to hear and determine, found that the city of Hudson had the exclusive right to establish, license and maintain ferries from the said city to the western shore of the river; and that it had no right to establish or license or maintain a ferry from Athens to the eastern shore, but that right belonged exclusively to the village of Athens, and he therefore ordered judgment restraining the village of Athens from running a ferry to transport passengers or property from any point on the eastern shore of Hudson river within the territorial limits of the city of Hudson to the western shore, and also restraining the plaintiff from running a ferry for like purpose from any point on the western shore within the limits of the village of Athens to the eastern shore.

From the judgment entered on the report the plaintiff alone appealed.

It will be seen that the vital question in the case, and the only question to be decided upon consideration of the merits, is whether the city of Hudson had, at the time of making the lease to plain-

tiff, an exclusive right to keep and maintain or license a ferry across the Hudson river to the village of Athens, to transport persons and property both ways.

The right to establish and maintain a public ferry is a franchise which can be exercised only by authority of the sovereign power — in this country by the authority of the State in which it is to be exercised. (*Conway* v. *Taylor's Exr.*, 1 Black, 603; *Chenango Bridge Co.* v. *Paige*, 83 N. Y., 178, 186.) A grant of a ferry franchise, like all other grants by the State, is to be strictly construed; that is, the intention of the grantor is to be carried out, but nothing is to pass by implication, except it is necessary to carry into effect the obvious intent of the grant. (*Rice* v. *Railroad Co.*, 1 Black, 358, 380, and cases cited.)

The city of Hudson was incorporated by chapter 83, Laws of 1785 (1 Greenl. Laws, 189, *et seq*). By section 14 of the act, power was granted to the common council to "settle, appoint, establish, order, direct and superintend" ferries "from the said city to the opposite or western shore of the Hudson's river, for the carrying and transporting people, horses, cattle, goods and chattels across the said river," provided nothing in that act should "be construed to debar or prevent Coenraedt A. Flaak of, or from conveying or carrying across the said river, to and from either side of the said river with a ferry boat, any person or persons, horses, cattle, goods or chattels."

In 1801, the legislature passed an act relative to the city of Hudson, giving to the common council power to establish, license and regulate ferries "from said city to the opposite or western shore," as in the Law of 1785, providing, however, that nothing in the act should be construed to deprive any person whatsoever of any right of ferriage which he now hath, or hereafter may obtain across the said river. In several subsequent acts of the legislature in regard to the city of Hudson, the power to establish and license ferries was continued in the common council of the city in substantially the same words as are above quoted, the form of expression being in each case, "from the said city to the western shore of the river." The word "exclusive" in regard to this grant of ferriage is first found in the Laws of 1829 (chap. 101.) The section in which it is granted reads in these words:

"§ 19. The said common council shall have exclusive power, from

time to time to establish, license and regulate such and so many ferries from the said city to the opposite western shore of the river, and in such manner as to them shall appear most conducive to the public good, but nothing herein contained shall be so construed to deprive any person of * * * any right of ferriage which any person now hath or hereafter may obtain across said river."

The last act in regard to the ferry privileges of the city (chap. 379, Laws of 1876) granted substantially the same rights as the Law of 1829 above quoted. These are the statutes under which the plaintiffs' rights are claimed. Two things are especially to be noticed : First, that the grant in each statute is to establish a ferry "from the said city to the western shore," and second, that since 1829 the grant has been "exclusive."

The first grant of any ferry from the village of Athens appears in an act of the legislature passed in 1804, entitled "an act granting to Timothy Bunker the exclusive privilege to ferry on the west side of the Hudson's river, at the village of Athens, in the county of Greene, for the term of five years."

This act grants to Bunker the right to cut a channel through the flat in the river between Hudson and Athens, and "to set up, keep and maintain a ferry across the Hudson's river, from the west side of the said river at Athens, at the termination of Ferry street, to any public landing or ferry stairs on the east side of said river at the city of Hudson." The act also prohibits any other person from maintaining a ferry on the west side of the river to transport persons and property across.

In 1805 the village of Athens, which was that year incorporated, seems to have become the owner of Bunker's franchise. Early the following year, and, as it seems, by the report of the referee, as the results of an understanding between the two municipalities, regulations were adopted by each, by which each one assumed to regulate the ferry from itself to the opposite shore. In these regulations each recognized the right of the other to control the ferry from its own side of the river, and each set of regulations contained a rule that its own ferryman might (in case of the absence of the ferryman of the other, and not otherwise) receive passengers and freight upon the opposite side of the river, and transport them to his own side, but that he should on demand pay the money for such ferriage

to the other ferryman. Under these regulations each ran its own ferry or leased it until 1815. From time to time, since 1815, the legislature have granted to the city and village jointly the right to improve the ferriage, and to lease the privileges of ferriage to any person. From 1815 to the end of 1838 the ferry was run on joint account by the two, each paying one-half the expenses. In February, 1839, the village of Athens leased to the city for twenty years " the ferry privileges between the city of Hudson and the village of Athens, which belong to the said village," at a rent of $725. By separate renewals for terms of ten years each, this lease continued until February 28, 1879, when the city of Hudson no longer renewed it, but leased to the plaintiff. In 1857, and while the city of Hudson still had the exclusive right as to ferries granted by the act of 1829 and subsequent acts, the legislature granted to the village of Athens " the exclusive power over the ferries from the said village to the eastern shore of the river." In 1870 Athens organized as a village under the general act, and in 1878 the legislature passed an act preserving to it any ferry franchises which it held before its organization under the general act. We may say that this last act was entirely superfluous, because the general act for the incorporation of villages under which Athens was reorganized, expressly saves to the reorganized village all property and rights of property which its predecessor had. (Laws of 1870, chap. 291, § 30.) A ferry franchise being property, the village did not lose it by such reorganization. (*Conway* v. *Taylor's Executor*, 1 Black, 603). The foregoing is a summary of so much as we deem material of the history of this ferry. It appears that since 1785 the city of Hudson has had a right of ferriage from the east to the west shores of the river, which since 1829 was by law made exclusive. It also appears that while the city had this right, and in 1804, the legislature granted to Bunker an exclusive right to ferry from Athens across. If the previous grant to Hudson of a ferry, gave the right to ferry both ways, then the grant to Bunker gave to him the same right exclusively for five years, and destroyed the grant to the city. But neither party so interpreted the laws, for we find that as soon as Athens was incorporated, the two corporations began to exercise the precise right which each then owned, according to the terms of the grant. From that time we find also that the legislature by its statutes recog-

nized that Athens had some ferry privileges which she might lease, and that Athens did in fact, during all the years to 1857, exercise or lease the very rights which were granted to Bunker for a limited time and afterwards claimed by her under assignment, and that the same rights were granted when her charter was amended in 1857. From these facts we think that a presumption arises that there was a grant of this right to Athens before 1857. (*Trotter* v. *Harris*, 2 Young & Jer., 285.) We find also that these two rights had for many years been peaceably enjoyed, had not been regarded as inconsistent, and had received the precise construction contended for by the defendants.

This practical construction of these grants by the interested parties, although it has not the force of a judicial decision, is of great weight and should not lightly be disregarded. (*Easton* v. *Pickersgill*, 55 N. Y., 310.) We find also that the legislature in granting ferry franchises used two forms of expression, one by which a ferry is granted from one side to the other only, the other by which the grant is " to and from either side " or " from one side to the other and back." An example of each is in section 14 of the Laws of 1785 incorporating the city of Hudson. A list of these acts will be found in 3 Revised Statutes (1st ed.), 639, and by reference to the acts the different mode of expression may be noticed. In the Laws of 1797 authorizing courts of common pleas to grant ferry licenses the legislature found it necessary to say, that in a certain case the license should be sufficient to enable the person receiving it to ferry " to and from either side of said water." (1 Webster's Laws, 164.) That clearly would not have been necessary if the license implied that right.

But the learned counsel for the appellant insists that the term " ferry " involves the idea of carrying both ways. If we abandon the strong evidence of practical construction and legislative action and go to the reported cases we shall find that they do not sustain his claim. We are referred to a number of cases in which the principle is recognized that a right of ferriage may exist from one side to another only of a stream, and indeed from one side only to the middle. (*Giles* v. *Groves*, 12 Ad. & Ell. [N. S.], 721; *Pim* v. *Curell*, 6 M. & W., 234; *People* v. *Babcock*, 11 Wend., 587; *Conway* v. *Taylor's Exr.*, 1 Black, 603, 605, 630; *Columbia D.*

*B. Co.* v. *Geisse*, 38 N. J. Law, 39 ; *B. and H. Ferry Co.* v. *Davis*, 30 Am., 390.) We are clear upon principle and authority that a ferry franchise can be granted giving the right to transport persons and property from one side of a stream to the other only.

The grant to the city of Hudson gave but this right. The referee was correct in so holding. This conclusion renders it unnecessary to examine the other questions discussed in the briefs. The case was properly disposed of by the referee having regard to the rights of both parties.

As the defendants have not appealed we cannot modify the judgment in their behalf in the matter of costs.

The judgment must be affirmed, with costs.

LEARNED, P. J., and OSBORN, J., concurred.

Judgment affirmed, with costs.